

U.S. Department of Justice

Criminal Division
Narcotic and Dangerous Drugs Section

*Name*  
*Trial Attorney*

*145 N Street, Northeast*  
*Washington, D.C. 20530*

April 19, 2024

By ECF

The Honorable Joseph A. Marutollo
United States Magistrate Judge
United States District Court
100 Federal Plaza
Central Islip, New York 11722

      Re: United States v. Jianfei Lu, aka Xian Le Li
        Criminal Docket No. 24-MJ-305

Dear Judge Marutollo,

  The government respectfully submits this letter in anticipation of the defendant's initial appearance and application for bail. The defendant is a serious risk of flight. Accordingly, the government respectfully requests that the Court enter a permanent order of detention.

  I. Factual and Procedural Background

    A. Summary of the Charges and Investigation

  On March 20, 2024, a federal grand jury sitting in the Western District of North Carolina returned a sealed indictment against Jianfei Lu (the "defendant") and four of his co-conspirators, charging them with: (1) money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i)g, and 1957(a); (2) concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; and (3) engaging in or attempting to engage in a monetary transaction involving criminally derived property, in violation of 18 U.S.C. §§ 1957(a) and 2. On March 20, 2024, the court in the Western District of North Carolina issued a sealed arrest warrant for the defendant. Pursuant to this arrest warrant, the Defendant was arrested in Flushing, New York, in the morning of April 18, 2024.

  The indictment in this case stems from a long-term and multi-agency investigation conducted by agents from the Drug Enforcement Administration ("DEA"), the Internal Revenue Service Criminal Investigation ("IRS-CI"), and the Homeland Security Investigations ("HSI") into a sprawling Chinese money laundering organization (hereinafter "Organization") with operatives in the United States, Mexico, China, and elsewhere. The investigation revealed that

the DTOs were delivering drug proceeds to the Organization utilizing a network of couriers who travel throughout the United States to collect drug proceeds from DTOs then deposit the drug proceeds into bank accounts controlled by the Organization at financial institutions including JPMorgan Chase, Bank of America, and Wells Fargo.

For example, Kowloon Holding, Inc., ("Kowloon") was a shell company controlled by the Organization. Multiple bank accounts were opened for Kowloon at various financial institutions. Within about five months, between May and September of 2022, the Organization's couriers known to be under a co-defendant's direction made at least 102 bulk cash deposits, totaling approximately $17.14 million, into Kowloon's accounts at various banks. The couriers carried out these bulk cash deposits in approximately 20 different states, including California, Florida, Illinois, Indiana, Missouri, North Carolina, Tennessee, Texas, Virginia, and Wisconsin. The bulk cash deposited into Kowloon's bank accounts—which were opened by a co-defendant—were usually wire transferred to other bank accounts on the same day before going through additional layers of transfers. For instance, in August 2022, a total of $5,670,264 was deposited into Kowloon's account at Chase Bank, and during the same month, a total of $5,651,593 was transferred out of the same account. Besides these deposits and transfers, Kowloon's bank records are void of any regular and recurring business expenses such as rents, payroll, taxes, purchase of inventory, etc.

The defendant and his co-defendants are members of the Organization and provided critical money laundering services to various drug trafficking organizations ("DTOs") throughout the United States, including the Western District of North Carolina. Starting from around May 2022 to the present, the defendant and his co-defendants are responsible for depositing at least $92 million of illicit fund into U.S. bank accounts controlled by the Organization. From April 2022 to December 2023 the defendant, alone, is responsible for depositing approximately $20,430,368 for the Organization.

When making these large bulk cash deposits at bank branches all over the U.S., the defendant would interchangeably use his real and fake identities. Below are two New York State driver's licenses the defendant had in his possession on November 15, 2022, when DEA Chicago agents arrested LU after observing LU conducting a bulk cash pickup with a suspected DTO member. One driver's license bears his real name and the other his fake identify, "Xian Le Li." The defendant made deposits totaling at least $4,663,031 during the course of the investigation using the name "Xian Le Li."

 

The Defendant is a resident of New York. The Defendant was born in China and is a citizen of China. The Government is not aware of any contacts the Defendant maintains in the Western District of North Carolina.

II. Legal Standard and Argument

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). If the court finds by a preponderance of the evidence that the defendant presents a flight risk and that no conditions will reasonably assure the defendant's continued presence, the court should order detention. United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger to the community, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis:

    (1)    "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm . . .";

    (2)    "the weight of the evidence against the person";

    (3)    "the history and characteristics of the person, including . . . the person's character, . . . past conduct, . . . [and]

>                    criminal history, and record concerning appearance at
>                    court proceedings"; and
>
> (4)      "the nature and seriousness of the danger to any person
>          or the community that would be posed by the person's
>          release."

The factors identified in the Bail Reform Act make clear that the defendant poses a risk of flight.

First, the charged crimes are serious and the defendant faces a lengthy prison term. Because of the high loss amount, the government estimates that the defendant, who is in a criminal history category I, who has never served time in prison, faces a United States Sentencing Guidelines range of 168 to 210 months, presuming a three-level reduction for acceptance of responsibility. The possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987).

Second, the evidence of the defendant's guilt is strong, providing "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

In addition to witnesses who can testify to some the Organization's money laundering activities, the government has amassed evidence of the defendant's laundering activities through analysis of financial records, flights records, and surveillance.

Third, the history and characteristics of the defendant weigh in favor of detention, making him a serious flight risk. During the course of the conspiracy, the defendant has used several different identities in order to conceal the scope of his money laundering activities. As outlined above, the defendant has no known ties to the Western District of North Carolina. Furthermore, he is a citizen of a country which has no extradition treaty with the United States. If the defendant were to flee to his home country, his return would be unlikely and could not be compelled.

Further, the defendant is a frequent and savvy traveler who takes trips to locations across the United States, in short periods of time and with little notice or lead time before departures. For a period of time during the conspiracy, the defendant even managed logistics of meetings between the Organization and DTO members that occurred in various states across the country.

Fourth, the government submits that in addition to being a risk of flight, the defendant poses a danger to the community based on the conduct charged. The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals,

4

such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

      The defendant and his Organization laundered money for DTOs. By moving millions of dollars in drug proceeds through various channels to include the U.S. banking system and cryptocurrency exchanges, the defendant and his co-conspirators directly empowered foreign and U.S.-based DTO to profit from the drug use and addiction of the American people and while continuing to flood the nation with illegal drugs, destroying lives and communities.

      MARLON COBAR, Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice
Washington, D.C. 20530


      */s/*
Samantha Thompson
Trial Attorney
Narcotic and Dangerous Drug Section
U.S. Department of Justice
Criminal Division
145 N Street, Northeast
East Wing, Second Floor
Washington, D.C. 20530
202-532-4466
Samantha.Thompson@usdoj.gov